**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JENNIFER BERNDT,<br><br>              Plaintiff,<br><br>      v.<br><br>HEYCO PRODUCTS CORPORATION,<br><br>              Defendant. | Civil Action No. 22-01300 (GC) (TJB)<br><br>**OPINION** |

**CASTNER, District Judge**

　　**THIS MATTER** comes before the Court upon Defendant Heyco Products Corporation's

Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure (Rule) 56.  (ECF No.

35.)  Plaintiff Jennifer Berndt opposed (ECF No. 39), and Defendant replied (ECF No. 40).  The

Court has carefully considered the parties' submissions and decides the matter without oral

argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b).  For the reasons set forth below,

and other good cause shown, the Motion for Summary Judgment is **DENIED**.

## I.    BACKGROUND[1]

### A.  Procedural Background

　　On February 3, 2022, Plaintiff filed her Complaint against Defendant in the Superior Court

---

[1]　　On a motion for summary judgment, the Court "draw[s] all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party."  *Jaffal v. Dir. Newark N.J. Field Off. Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (quoting *Bryan v. United States*, 913 F.3d 356, 361 n.10 (3d Cir. 2019)).  The factual circumstances surrounding this action, as revealed through discovery, are set forth in the parties' submissions in accordance with Local Civil Rule 56.1.  Defendant's Statement of Undisputed Material Facts (SUMF) is at ECF No. 35-2, Plaintiff's Responsive Statement of Material Facts (RSMF) is at ECF No. 39-1, Plaintiff's Supplemental Statement of Material Facts (SSMF) is at ECF No. 39-1, and Defendant's Reply to

of New Jersey, Law Division, Ocean County.  (ECF No. 1.)  Defendant thereafter removed the matter to this Court based on diversity jurisdiction under 28 U.S.C. § 1332.  (*Id.*)  Plaintiff's one-count Complaint alleges a violation of the New Jersey Conscientious Employee Protection Act (CEPA), N.J. Stat. Ann. § 34:19-1 *et seq.*  (*Id.* at 13.[2])

### B.  Statement of Facts

On March 2, 2020, Plaintiff began working as a molding machine operator for Defendant in its Toms River facility.  (SUMF ¶ 1.)  Plaintiff initially worked day shifts until April 2021, when, upon her request, she was transferred to night shifts.  (*Id.* ¶ 2.)  Jeff Culp supervised Plaintiff during her time working day shifts, while Rocco "Rocky" Mellito supervised her on the night shifts.  (*Id.* ¶ 3.)  The Toms River facility where Plaintiff worked staffs approximately 110 employees.  (*Id.* ¶ 4.)  Of the 110 employees, only eight employees work in molding: four on the day shift and four on the night shift.  (*Id.*)

#### 1.  Email Exchange

In early June 2020, just a few months after Plaintiff began working for Defendant, Plaintiff and Colleen Faulknor,[3] Defendant's Vice President of Administration, exchanged numerous emails regarding Plaintiff's job responsibilities and requirements, specifically in the context of the physical requirements for Plaintiff's job.  (*See* ECF No. 35-3 at 21-37.)  The job specification that Defendant provided to Plaintiff indicated that Plaintiff could be required to lift items weighing up to 75 pounds without mechanical assistance.  (*Id.*)  In these email exchanges, Plaintiff expressed

---

Supplemental Statement of Material Facts (RSSMF) is at ECF No. 40-2.

[2]    Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

[3]    Faulknor was the only individual working in Defendant's Human Resources Department.  (SSMF ¶ 20.)

concern about having to move pallets that can weigh up to 1,000 pounds or more manually without using a forklift. (*Id.*) Faulknor explained that Plaintiff could use "pallet/hand jacks" and forklifts —which Plaintiff was scheduled to receive training on—to move heavier items. (*Id.*) In response, Plaintiff indicated that she would not "use the pallet jack or fork[]lift until it's in [her] job description . . . especially if it's something that could possibly injure [her] such as handling large amounts of weight." (*Id.*) Faulkner explained to Plaintiff that the job description contained the language "perform other duties as required" and that failure to "perform a duty because it is not in [her] job description is unacceptable and may be considered insubordination." (*Id.*) Faulknor also noted that the company "cannot possibly include every single task that occurs for every job every day." (*Id.*) Moreover, Faulknor explained that "everyone in Molding [was] moving material [with mechanical assistance] or by lifting the boxes manually as they are able" to and that "a reasonable accommodation" could be made for Plaintiff if needed. (*Id.*) In the exchange, Plaintiff indicated that she planned to contact the Occupational Safety and Health Administration (OSHA) because of her concerns about being able to safely perform her job. (*Id.*)

During Plaintiff's deposition, she testified that she emailed Faulknor because she was experiencing pain in her knee and wanted to understand the job responsibilities. (SUMF ¶ 8.) Plaintiff further testified that her knee pain was a result of pulling more than 1,000 pounds worth of pallets and that the working conditions (*i.e.*, the moving of heavy pallets) were unsafe given her size and gender. (*Id.*) As evidenced by the email exchange between Plaintiff and Faulknor, Faulknor repeatedly told Plaintiff to immediately report any injuries that she sustained while working. (*See* ECF No. 35-3 at 21-37.) Faulkner also explained to Plaintiff that she should not be "doing anything that can cause injury." (*Id.*)

Plaintiff also testified that on June 7, 2020, she began training on how to operate a forklift.

(SUMF ¶ 6.)  According to Plaintiff, she was shown a video and took a written test as part of her training.  (ECF No. 35-3 at 9.)  Despite passing the written test, Plaintiff "discontinued . . . forklift training" as it was not required for her job.  (*Id.* at 9-10.)

By the end of June 2020, and after Plaintiff indicated that she would contact OSHA, Faulknor had left Plaintiff three voicemails to discuss Plaintiff's concerns about the physical aspects of the job.  (SUMF ¶ 11.)  The email exchange between Plaintiff and Faulknor indicates that Faulknor sent three emails to Plaintiff after leaving the three voicemails and that Plaintiff did not respond to those emails.  (ECF No. 35-3 at 22-23.)  During Plaintiff's deposition, she testified that she did not recall why she failed to call back Faulknor or respond to the emails.  (SUMF ¶¶ 10 & 11.)

### 2.  *The Prank*

In March 2021, while Plaintiff was working the day shift, she found "purge" (*i.e.*, discarded melted nylon) on her black chair that was "larger than a softball" and "like a brownish color."  (*Id.* ¶ 12.)  Purge does not have "any sharp edges or any kind of dangerous qualities" but is "very hot when it comes out."  (*Id.* ¶ 14.)  After seeing the purge, Plaintiff contacted her supervisor and complained to Faulknor, who began an investigation.  (*Id.* ¶ 13.)  As part of her investigation, Faulknor reviewed surveillance footage from the area where the purge was left and determined that the individuals involved were employees John C. and Brian Hennessey; John C. and Hennessey were disciplined.  (*Id.* ¶ 15.)  During Plaintiff's deposition, she testified that the disciplinary action—Faulknor writing the two employees up—was appropriate.  (*Id.* ¶ 16; *see* ECF No. 35-3 at 7.)  No other incidents occurred between John C. or Hennessey and Plaintiff during her employment.  (SUMF ¶ 17.)  Following the purge incident, Plaintiff requested and received a transfer to the night shift, which came with a $1 per hour pay increase.  (*Id.* ¶ 18.)

### 3.  *Safety Complaints*

On March 30, 2021, Plaintiff emailed Faulknor that the molding department had "faulty equipment and malfunction[ing] machines ranging from frustrating and exhausting to hazardous" and she "had a machine that produced a loud explosion noise and sparks." (*Id.* ¶ 19.)  During her deposition, Plaintiff testified that "one of the operators told [her] he saw sparks emitted from the machine." (*Id.* ¶ 20.)  At her deposition, Plaintiff testified that she is not a mechanic. (*Id.* ¶ 21.)

On April 5, 2021, Plaintiff also reported alleged safety concerns to Danny Anthony, the Vice President of Operations, and Matt Hadam, a molding production manager for Defendant, which were relayed to Faulknor on April 6, 2021. (ECF No. 39-9.)  Anthony informed Faulknor that these issues—such as a machine producing sparks, a conveyor belt not functioning properly, runner issues, machine scale issues, etc.—were either resolved or were in the process of being resolved and/or addressed. (*Id.*)  Anthony also informed Faulknor that he told Plaintiff "that there hasn't been a safety issue which we haven't addressed and appreciated her bringing these concerns to our attention." (*Id.*)

On July 13, 2021, Plaintiff made complaints to Faulknor about machinery issues that she originally mentioned to Anthony and Hadam. (SSMF ¶ 31.)  In response, Faulknor stated that she knew "everyone [was] trying to do the best that they can do." (ECF No. 39-19 at 5.)  She explained that Defendant was "having a difficult time staffing" but assured Plaintiff that Defendant was "trying to resolve the machine problems and staffing problems as quickly and efficiently" as possible. (*Id.*)

Plaintiff also reported safety issues to Culp, one of her managers.[4]  During his deposition, Culp testified to the following: "Some of the equipment in there is kind of falling apart and it's

---

[4]    It is unclear from the record when Plaintiff made these complaints to Culp.

maintenance is due.  We need to either do away with the equipment or fix it or, you know, get new [equipment]."  (SSMF ¶ 2.)  Culp also testified that Plaintiff "would always point out that the equipment did not have proper guards," and would generally make complaints about the safety of the equipment.  (*Id.* ¶¶ 3-4.)  Culp further testified that he made similar safety complaints to management.  (*Id.* ¶ 5.)

During his deposition, Culp testified that he specifically relayed Plaintiff's safety concerns to his manager, Chris Hoffman.  (*Id.* ¶ 6.)  Moreover, Culp testified that alleged faulty equipment was still being used after safety complaints were made and that employees were injured as a consequence of Defendant's failure to correct safety concerns brought to its attention.  (*Id.* ¶¶ 7, 9-10.)  Additionally, Culp testified that productivity would have been affected if Defendant did not permit the use of equipment with alleged safety issues.  (*Id.* ¶ 8.)  Defendant disputes all of Plaintiff's allegations related to Culp.  (RSSMF ¶¶ 2-10.[5])

### 4.  *Personnel Complaints*

The record is clear that Plaintiff and her colleagues reported personnel issues about one another.  On December 7, 2020, Hadam sent an email to Faulknor indicating that Plaintiff, after being released for full duty after a brief medical leave, said she was "not lifting those drums anymore."[6]  (ECF No. 35-3 at 62.)  After she was asked to empty the bins more frequently so there was less weight, Plaintiff stated "that's how I got hurt, by doing it too many times."  (*Id.*)  Hadam

---

[5]    Defendant also asserts that Culp does not fall within the scope of a "decisionmaker" for purposes of CEPA and that Culp's deposition testimony is hearsay, speculative, and an impermissible lay opinion.  (RSSMF ¶¶ 2-10.)

[6]    Plaintiff had previously suffered a work injury while operating plastic molding equipment, which resulted in a worker's compensation case being opened.  (SSMF ¶ 13.)  Defendant asserts that this information is irrelevant because Plaintiff was cleared to resume her "full duty" at work in December 2020.  (RSSMF ¶ 13.)

then told Plaintiff he would get her help to lift the drums.[7]  (*Id.*)

The following day, Hadam sent another email to Faulknor informing her of an incident between Plaintiff and Michael Heenan, another employee working for Defendant.  (SUMF ¶ 26-27.)  The email indicated that there was tension between the two employees and that when Heenan would go to Plaintiff's side of the room looking to help her with machinery, "Plaintiff insist[ed] she d[id] not need help, etc."  (ECF No. 35-3 at 64.)  The email also indicates that Heenan was going to stay away from Plaintiff and that he was going to be transferred to the night shift.  (*Id.*)

On July 1, 2021, Plaintiff made a verbal complaint to her supervisor, Rocky, that Heenan was yelling at her regarding material he was trying to throw away.  (SUMF ¶ 22.)  Plaintiff emailed Faulknor in response.  (ECF No. 39-19.)  Faulknor responded to Plaintiff and indicated that "the issue ha[d] been handled by [her] directly with [Heenan]," and that she "did not expect [Plaintiff] to have any further issues with [Heenan] in the future."  (*Id.*)

On July 13, 2021, Rocky sent an email to Faulknor about Plaintiff leaving work early because "she didn't feel good" and also stated that "she's not sick, by the way[] [but rather] was complaining all night about the work she had to do"; the email also indicated that Plaintiff had previously walked out during a shift before.  (SUMF ¶¶ 28-29.)  The email further stated the following: "It's my opinion, seriously, [Plaintiff is] not worth the effort.  At least not in this department.  I'm not saying you should fire her, but this can't keep happening either.  There is too much work to do."  (*Id.* ¶ 29.)

Plaintiff relayed this incident to Hadam via text message: "Last night I was having constant problems with machines. . . .  Rocky and Gage tried to fix them but the issues kept occurring and

---

[7]     It is worth noting that Defendant did provide an accommodation to Plaintiff after she returned from her medical leave.  (RSMF ¶ 26 (noting that Defendant accommodated Plaintiff's request to not lift heavy weights).)

after 5 hours of dealing with that I got so overwhelmed that I [didn't] feel well and needed to leave" and "when I told [R]ocky I had to go he said I could get fired which made it worse." (*Id.* ¶ 30.)

On July 14, 2021, Rocky sent another email to Faulknor explaining that when he asked "a few things . . . of [Plaintiff, she gave him] a very strong attitude" and Plaintiff was "very agitated and was really venting her frustration at" him. (*Id.* ¶¶ 31 & 37; ECF No. 35-3 at 58.) The email also indicated that Rocky asked Plaintiff to "fill out [t]he training sheet for [the company's] records" but "[s]he adamantly refused because she claim[ed] that she was never properly trained and had to learn all of our processes by herself." (SUMF ¶ 32; ECF No. 35-3 at 58.)

The email also indicated that during Plaintiff's shift, she left a trail of regrind material on the floor and was confronted by Heenan, "possibly in a raised tone," to clean up the mess.[8] (ECF No. 35-3 at 58.) It was during this encounter where Plaintiff informed Rocky that she was looking for employment elsewhere. (*Id.*) Rocky also asked Heenan to "stay away from Plaintiff and don't even make eye contact if possible," which he agreed to even though he was "not happy about having to work in such an environment as well." (*Id.*) The parties dispute whether the mess was cleaned up and who cleaned up the mess.[9] (SUMF ¶¶ 33-35; RSMF ¶¶ 33-35.)

### 5. *Employment Reviews and Termination*

Plaintiff received her first performance review on June 21, 2020, approximately four months after starting her employment with Defendant. (ECF No. 39-12.) Her "overall assessment

---

[8]    The record also indicates that Heenan had issues with other employees. In particular, Heenan assaulted Culp and was subsequently terminated after the assault. (SSMF ¶¶ 16-19.)

[9]    During Plaintiff's deposition, she testified that on July 15, 2021, Heenan started "antagoniz[ing]" her again, and Rocky told him to leave the area. (RSMF ¶ 23; ECF No. 35-3 at 11.)

of performance" fell within the category of "meets job requirements." (*Id.*) The performance evaluation also stated the following: "[Plaintiff] has shown improvement since starting as a molding machine operator. [She] has an exceptional eye for detail and she is very thorough in her inspections of parts for her area. She is a team player on her shift and always willing to help out her fellow employees." (*Id.*)

Plaintiff received her second evaluation on April 6, 2021, approximately three months before she was eventually terminated. (*Id.*) Her "overall assessment of performance" remained the same, and she received the following additional comment: "[Plaintiff] does well in her job as [a] machine operator. She has an eye for quality of the parts we make and always looks to improve her work environment. [Plaintiff] is pleasant to work with and takes her job seriously." (*Id.*) During her time with Defendant, Plaintiff was not placed on any performance improvement plans or corrective action plans, nor did she receive any disciplinary action. (SSMF ¶¶ 27-28.) During Faulknor's deposition, Faulknor testified that Defendant does not have a disciplinary policy for its workers. (SSMF ¶ 21.)

On July 16, 2021, Plaintiff was terminated. Faulknor testified that the termination was because Plaintiff "did not get along with her co-workers – that was the biggest reason, she didn't get along with her co-workers." (ECF No. 35-3 at 52.) During her deposition, Faulknor testified that not getting along with co-workers "went both ways." (*Id.*) Faulknor also informed Plaintiff that she was not a good fit for Defendant. (SSMF ¶ 34.) When asked directly whether Plaintiff "was not a good fit because she made safety complaints," or "because she complained about equipment malfunctions," Faulknor responded, "no." (ECF No. 35-3 at 52.)

## II.   **LEGAL STANDARD**

Summary judgment shall be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* When deciding the existence of a genuine dispute of material fact, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The Court must grant summary judgment if any party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 616 (D.N.J. 2023) ("In the face of a properly supported summary judgment motion, the nonmovant's burden is rigorous: the party 'must point to concrete evidence in the record'—mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment." (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995))). "[I]nferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983).

## III.    **DISCUSSION**

Plaintiff brings a single CEPA claim based on retaliation for purportedly making safety complaints. CEPA is intended to protect whistleblowers from retaliation by their employers. *Lippman v. Ethicon, Inc.*, 119 A.3d 215, 224 (N.J. 2015). The Act is designed to "encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." *Id.* at 225 (quoting *Abbamont v. Piscataway*

*Twp. Bd. of Educ.*, 650 A.2d 958, 971 (N.J. 1994)).  CEPA applies where an employee reports their coworker's misconduct.  *Higgins v. Pascack Valley Hosp.*, 730 A.2d 327, 338 (N.J. 1999) ("CEPA prohibits an employer from taking retaliatory action against an employee who has a reasonable basis for objecting to a co-employee's activity, policy, or practice covered [by CEPA]."). Importantly, "CEPA is remedial legislation and must therefore be construed liberally in employees' favor."  *Fraternal Ord. of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 240 (3d Cir. 2016).

Analyzing a CEPA claim requires a three-part inquiry.[10]  "First, the court must determine if the plaintiff has established a prima facie case of retaliatory discharge under CEPA."  *Morro v. DGMB Casino LLC,* 112 F. Supp. 3d 260, 282 (D.N.J. 2015).  If a plaintiff makes out a prima facie case, "the burden shifts to [the] defendant to articulate some legitimate nondiscriminatory reason for making the adverse employment decision."  *Id.*  If the defendant meets that burden, "the burden shifts back to the plaintiff, who, in order to survive summary judgment, must raise an issue of fact that the articulated reason is a pretext for the retaliation or that a discriminatory reason more likely motivated the employer."  *Id.*  All three prongs are at issue in this case.

### A.  Prima Facie Case

To establish a prima facie case under CEPA, Plaintiff must first demonstrate that: (1) she reasonably believed that Defendant's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) she performed a "whistle-blowing" activity described in N.J. Stat. Ann. § 34:19-3(c); (3) an adverse employment action was taken against her; and (4) a causal connection exists between the whistle-blowing activity and the

---

[10]    "The burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) applies to claims under CEPA."  *Caldwell v. Amazon.com Servs. LLC*, Civ. No. 22-7251, 2024 WL 4589776, at *4 (D.N.J. Oct. 28, 2024) (citing *Walsh v. Bril-Jil Enters. Inc.*, Civ. No. 15-0872, 2016 WL 6246764, at *11 (D.N.J. Oct. 24, 2016)).

adverse employment action. *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003). "[T]he court decides, as a matter of law, whether or not a plaintiff has carried his or her burden of demonstrating the elements of the prima facie case and that those elements are not part of the proofs at trial for re-consideration by the jury." *Tartaglia v. UBS PaineWebber Inc.*, 961 A.2d 1167, 1192 (N.J. 2008). At the prima facie stage, the evidentiary burden is "rather modest." *Dolinski v. Borough of Watchung*, Dkt. No. A-0605-22, 2022 WL 2542356, at *7 (N.J. Super. Ct. App. Div. July 8, 2022) (quoting *Zive v. Stanley Roberts, Inc.*, 867 A.2d 1133, 1139 (N.J. 2005)).

### 1. Reasonable Belief

As to the first prong, Defendant argues that Plaintiff's "alleged 'complaints' were nothing more than vague, subjective and irrational fears of harm that only implicated safety in her own mind, with no basis in fact or reality." (ECF No. 35-1 at 24.) Conversely, Plaintiff asserts that she reported "complaints pertaining to safety requirements mandated by OSHA [that] were made with an objectively reasonable belief." (ECF No. 39 at 7.)

"[A] plaintiff is not required to show that the relevant legal authority or clear mandate of public policy 'actually would be violated if all the facts he or she alleges are true.'" *Hitesman v. Bridgeway Inc.*, 63 A.3d 230, 238 (N.J. Super. Ct. App. Div. 2013), *aff'd*, 93 A.3d 306 (N.J. 2014) (quoting *Dzwonar*, 828 A.2d at 901). Rather, a plaintiff "must 'set forth facts that would support an objectively reasonable belief that a violation has occurred.'" *Id.* As a result, a plaintiff is not required to specifically identify a law, rule, regulation or public policy so long as the Court can do so based on the facts of the case. *See Caldwell v. Amazon.com Servs. LLC*, Civ. No. 22-7251, 2024 WL 4589776, at *4 (D.N.J. Oct. 28, 2024) (identifying the relevant law based on the facts of the case even though the plaintiff failed to do so).

As courts have recognized, "[b]efore a CEPA claim may be submitted to a jury, [a] court

12

must identify a legal authority recognized in the statute 'that closely relates to the complained-of conduct[,]' and 'make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy identified." *Hitesman*, 63 A.3d at 238 (quoting *Dzwonar*, 828 A.2d at 901). "If the required substantial nexus is not shown, the case should not proceed to a jury." *Chiofalo v. State of New Jersey*, 213 A.3d 900, 909 (N.J. 2019). If a court does find a substantial nexus and the case proceeds to the jury, "[t]he jury must then decide 'whether the plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable.'" *Hitesman*, 63 A.3d at 238 (quoting *Dzwonar*, 828 A.2d at 901).

As part of this analysis, courts should be mindful that "CEPA is not intended 'to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe to be unlawful.'" *Fraternal Ord. of Police, Lodge 1*, 842 F.3d at 240 (quoting *Blackburn v. U.S. Parcel Serv., Inc.*, 179 F.3d 81, 93 n.4 (3d Cir. 1999)). To employ a contrary standard "that is more appropriate for someone with a law degree" would impose an obstacle that "is as unfair as it is unreasonable." *Id.*

Plaintiff asserts that the legal authority Defendant allegedly violated are OSHA standards. (*See* ECF No. 1 at 9; ECF No. 39 at 7-9.) The Occupational Safety and Health Act (OSH Act) was "enacted in 1970 in response to an alarming epidemic of industrial injuries and deaths." *Ries v. Nat'l R.R. Passenger Corp.*, 960 F.2d 1156, 1160 (3d Cir. 1992). Importantly, "[l]ike other safety statutes, [the OSH Act] is to be construed broadly in favor of ensuring workplace safety." *Id.* But "[a]lthough [the OSH Act] covers a wide range of workplace injuries, it was not meant to be an all-encompassing statute." *Id.*

Plaintiff asserts that she reported multiple safety-related complaints to Faulknor and Culp about allegedly faulty machinery in Defendant's facility and cites to various OSHA regulations in

support.  *See, e.g.*, 29 C.F.R. § 1910.178(l)(1), (6) (regulatory requirements related to powered industrial trucks); 29 C.F.R. § 1910.212 (general requirements for all machines, including requirements for machine guarding).  Specifically, Plaintiff asserts that she complained that the machinery did not have "proper guarding."  (SSMF ¶¶ 3-4.)  Moreover, Plaintiff points to Culp's deposition where he testified that he made similar safety complaints to his supervisor and that employees had sustained injuries from faulty equipment.  (*Id.* ¶¶ 5, 7, 9-10.)  When viewing the evidence in the light most favorable to Plaintiff, Plaintiff has shown a substantial nexus to possible OSHA violations based on Plaintiff's complaints to Culp and Faulknor about Defendant's allegedly faulty machinery, in conjunction with Defendant's acknowledgment of Plaintiff's complaints and repeated assurances that Defendant was trying to resolve these complaints.  (*See, e.g.*, SUMF ¶¶ 19-21; SSMF ¶ 31; ECF No. 39-9.)  Further, Plaintiff's belief that Defendant violated a law (*i.e.*, OSHA regulations) by failing to maintain proper guards for its machinery was reasonable given the evidence in the record that these issues were raised by other employees.  *See Dejewski v. Nat'l Beverage Corp.*, 735 F. Supp. 3d 511, 519-22 (D.N.J. 2024) (finding the substantial nexus test met because the plaintiff pointed to a relevant statute (the New Jersey Consumer Fraud Act) and evidence that the defendant corporation was about to falsely announce that all the product cans were BPA free when they were not); *Caldwell*, 2024 WL 4589776, at *4 (finding the substantial nexus test met because the plaintiff pointed to a relevant statute (the New Jersey Wage Payment Law) and evidence that the defendant failed to pay the plaintiff lost wages).

Defendant argues that Plaintiff's complaints do not constitute a violation of a law or public policy.  (ECF No. 35-1 at 23-25; ECF No. 40 at 7-12.)  However, Defendant's argument places too great a burden on Plaintiff as to the prima facie prong.  *See Mazza v. George Yelland, Inc.*, 161 F. Supp. 2d 376, 379 (D.N.J. 2001) (rejecting the defendant's argument that "a prima facie CEPA

14

claim requires the plaintiff to show an actual violation of law or policy"). Indeed, under the first prong of CEPA, once a court determines that there is substantial nexus between the complained-of conduct and a law or public policy identified, a plaintiff is only required to demonstrate a reasonable belief that their employer violated the law. *See Dzwonar*, 828 A.2d at 901; *Dejewski*, 735 F. Supp. 3d at 522 ("Using a company website to suggest to potential consumers that a product line is one thing (fully BPA free) if it was, in fact, not --- that would go a long way to a 'misrepresentation . . . in connection with [a] sale or advertisement' covered by the Consumer Fraud Act . . . [b]ut certainly well past the marker set down by the CEPA 'substantial nexus' test."). Therefore, Plaintiff is not required to show an actual violation of law. The Court is satisfied that Plaintiff has satisfied the first prong of CEPA.[11]

### 2.  *Whistle-Blowing Activity*

As to the second prong, it does not appear that Defendant challenges whether Plaintiff engaged in whistle-blowing activity.[12] To prove a CEPA claim, a "plaintiff must establish that he

---

[11]  The Court also rejects Defendant's argument that Culp's deposition testimony is hearsay and cannot be considered by the Court. (ECF No. 40 at 8, 10.) "[H]earsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial." *Fraternal Ord. of Police, Lodge 1*, 842 F.3d at 238 (quoting *Stelwagon Mfg. Co. v. Tarmac Roofing Sys.*, 63 F.3d 1267, 1275 n.17 (3d Cir. 1995)). Importantly, "[i]n ruling on a motion for summary judgment, the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial." *Id.* Here, many of Culp's statements would presumably be admissible at trial as he could be called as a witness to testify about his conversations with Plaintiff, his own safety reports to supervisors, and his opinion about productivity levels when equipment is not functioning or removed for service. The Court does not, however, definitively resolve the issue of whether Culp's statements are indeed admissible at trial as such issue need not be resolved at the summary judgment stage. *See id.* at 239.

[12]  To the extent Defendant challenges the second prong in its reply brief, the Court will not consider such arguments. (*See* ECF No. 40 at 11-12.) It is axiomatic that "a 'moving party may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief.'" *Judge v. United States*, 119 F. Supp. 3d 270, 284 (D.N.J. 2015) (quoting *D'Allessandro v. Bugler Tobacco Co.*, Civ. No. 05-5051, 2007 WL 130798, at *2 (D.N.J. Jan. 12, 2007)). This is so because "[b]asic fairness requires that an opposing party have a fair notice of

or she performed a whistle-blowing activity described in [N.J. Stat. Ann. §] 34:19-3(c)." *Caldwell*, WL 4589776, at *5. Whistle-blowing activities include "a notification, or threat of notification, to an outside agency or a supervisor." *Id.* (citing *Tartaglia*, 961 A.2d at 1181). It is clear from the record that Plaintiff did indeed report safety complaints to her supervisors and Faulknor. Therefore, the Court finds that Plaintiff has satisfied this prong.

### 3. *Adverse Employment Action*

The third prong requires Plaintiff to demonstrate that she suffered an adverse employment action. It is undisputed from the record that Plaintiff was terminated on July 16, 2021. (SUMF ¶ 38.) Therefore, Plaintiff has clearly suffered an adverse employment action. *See Fraternal Ord. of Police, Lodge 1*, 842 F.3d at 241 (noting that CEPA "defines retaliation as including 'discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment'" (quoting N.J. Stat. Ann. § 34:19-2(e))).

### 4. *Causation*

Defendant argues that "there is no causal connection between Plaintiff's protected activity and Plaintiff's termination." (ECF No. 35-1 at 25.) Specifically, Defendant argues that Plaintiff "has no evidence, other than her own unsupported opinion, that her insubordination and refusal to perform tasks assigned to her did not warrant termination, that it was not the true reason for her termination, or that the real reason for that termination was retaliation for her alleged protected activity." (*Id.* at 26.) Conversely, Plaintiff asserts that "[t]he temporal proximity between Plaintiff's complaints and the termination of her employment provides an inference of causation" and that evidence in the record "highlight[s] the inconsistencies and contradictions in Defendant's

---

his adversary's claims, as well as an opportunity to address those claims." *Id.* (quoting *Soto v. United States*, Civ. No. 04-2108, 2005 WL 3078177, at *6 (D.N.J. Nov. 16, 2005)).

proffered reasons for terminating Plaintiff."  (ECF No. 39 at 10-11.)

"To satisfy the fourth prong, a plaintiff must provide some evidence of a causal connection between the retaliatory action and the alleged 'whistle-blowing' activity." *Caldwell*, WL 4589776, at *6 (quoting *Kolb v. Burns*, 727 A.2d 525, 530 (N.J. Super. Ct. App. Div. 1999)).  As courts in this District have recognized, "[t]o establish this causal link, a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) temporal proximity plus some additional evidence of causation." *Damiani v. CMG Mortg. Inc.*, Civ. No. 22-04783, 2024 WL 2746086, at *8 (D.N.J. May 28, 2024). "Temporal proximity may be used to show causation in certain circumstances but alone it is generally not enough to establish causation unless it is unusually suggestive of retaliation." *Caldwell*, 2024 WL 4589776, at *6 (citing *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997)).  However, a termination occurring "within a few days but no longer than a month" is typically sufficient to show an unduly suggestive action. *Yu v. U.S. Dep't of Veterans Affs.*, 528 F. App'x 181, 185 (3d Cir. 2013).

Moreover, when evaluating causation, courts should be mindful that "a chain running from cause to effect can be built up and locked into place—but it can also be broken.  A 'causal connection may be severed by . . . some legitimate intervening event.'" *Mirena v. Exec. Jet Mgmt., Inc.*, 760 F. Supp. 3d 224, 232 (D.N.J. 2024) (quoting *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 330 (3d Cir. 2016)).

Here, Plaintiff "must produce evidence which would permit a reasonable jury to find that it is 'more likely than not'" that her safety complaints were a "determinative or substantial motivating factor" in Defendant's decision to terminate her employment.  *Caldwell*, 2024 WL 4589776, at *6 (quoting *Donofry v. Autotote Sys., Inc.*, 795 A.2d 260, 272 (N.J. Super. Ct. App.

Div. 2001)).  The temporal proximity of Plaintiff's termination—three days after her final safety related complaint (*see* ECF No. 39-19 at 5)—appears to be "unusually suggestive" to support an inference of retaliation.  As a result, the Court finds that based on Plaintiff's safety complaint on July 13, 2021, and her termination three days later on July 16, 2021, a reasonable jury could find that it is more likely than not that Plaintiff was terminated for her whistle-blowing activity.

The United States Court of Appeals for the Third Circuit's decision in *Duong v. Benihana National Corporation* is instructive on this point.  Civ. No. 21-1088, 2022 WL 1125392, at *4 (3d Cir. April 15, 2022).  In *Duong*, the Third Circuit "assume[d] that [the plaintiff] ha[d] made out a prima facie case of retaliatory termination" because of "the temporal proximity between [the plaintiff's] complaints about uncleanliness and harassment in the workplace and his termination." *Id.* at *4 n.6.  According to the plaintiff, "his series of complaints began around January 2018 and continued at least through April 2018, just days before he was terminated." *Id.*  Given the striking similarity between *Duong* and the present matter where Plaintiff reported several safety complaints to her supervisors and Faulknor, spanning a similar timeframe as the plaintiff in *Duong*, the Court can assume that Plaintiff has met her burden as to causation.  (*See* SUMF ¶¶ 19-20; SSMF ¶¶ 2-10, 31; ECF No. 39-9; ECF No. 39-19.)  *See also Zeqo v. Selco Mfg. Corp.*, Civ. No. 21-15240, 2024 WL 2130826, at *5 (D.N.J. May 13, 2024) (finding that the plaintiff's termination one week after reporting his concerns regarding COVID-19, along with the surrounding circumstances of the plaintiff's termination, was sufficient to prove the causation prong).

Therefore, the Court finds that Plaintiff has satisfied her burden of establishing a prima facie case of retaliatory discharge.

## B.  Legitimate, Non-Discriminatory Reason for Plaintiff's Termination

Plaintiff asserts that Defendant "manufactured reasons to justify its termination of [her]

employment." (ECF No. 39 at 11-12.)  The Court disagrees.

"Where a Plaintiff established a prima facie case, the burden of production then shifts to Defendant to articulate a legitimate, non-discriminatory reason for the employment decision." *Damiani*, 2024 WL 2746086, at \*10 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993)).  This is a "light burden."  *Id.*  Here, Defendant satisfies this light burden because the record shows that she was terminated because "[s]he did not get along with her co-workers."  (ECF No. 35-3 at 52.)   The record also clearly shows that Plaintiff had altercations with her co-workers. (SUMF ¶¶ 22, 26, 28-32, 37; ECF No. 35-3 at 58, 62, 64.)  *See Fairclough v. Wawa, Inc.*, 412 F. App'x 465, 470 (3d Cir. 2010) (noting that "not get[ting] along with other employees" is a legitimate nondiscriminatory reason for terminating an employee); *Zalinskie v. Rosner L. Offs., P.C.*, Civ. No. 12-289, 2014 WL 956022, at \*7 (D.N.J. Mar. 12, 2014) (citing *Bellissimo v. Westinghouse Elec. Corp.*, 764 F.2d 175, 181 (3d Cir.1985) (noting that the "inability to get along with [other workers] is a legitimate reason for discharge").  Further, the record indicates that Faulknor informed Plaintiff that she was not a good fit for Defendant.  (SSMF ¶ 34.)

Therefore, the Court is satisfied that Defendant has met its burden to show a legitimate non-discriminatory reason for its decision to terminate Plaintiff.

## C. Pretext

Plaintiff asserts that Defendant's reason for terminating her was pretextual, and that her repeated safety complaints were the real reason for her termination.  For support, Plaintiff points to Defendant's disciplinary history of other workers as support.  (ECF No. 39 at 14.)  Defendant argues that there is no evidence in the record that its stated reasons for terminating Plaintiff are false and that the company had any retaliatory motive.  (ECF No. 35-1 at 26-27; ECF No. 40 at 4-12.)

Once the defendant has set forth a legitimate, non-discriminatory reason for the adverse action, the burden shifts back to the plaintiff to submit evidence from which a fact finder could reasonably: "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Lowery v. Yoram Koby and JYK, Inc.*, Civ. No. 11-5088, 2016 WL 324948, at \*7 (D.N.J. Jan 26, 2016) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). "The plaintiff may satisfy this prong and establish pretext without citing anything beyond the evidence proffered to support her prima facie case." *Damiani*, 2024 WL 2746086, at \*10; *Lowery*, 2016 WL 324948, at \*7 (noting that the pretext analysis is factually inseparable from the causation element of the prima facie case (quoting *Zaffuto v. Wal-Mart Stores, Inc.*, 130 F. App'x 566, 569 (3d Cir. 2005)). Relevant evidence for this inquiry "may include evidence that 'demonstrate[s] such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-[retaliatory] reasons.'" *Lowery*, 2016 WL 324948, at \*7 (quoting *Fuentes*, 32 F.3d at 765).

As is relevant to this case, inconsistent enforcement actions can be evidence of pretext. *Duong*, 2022 WL 1125392, at \*5 (citing *Blackburn*, 179 F.3d at 95). When a plaintiff tries to prove pretext by this means, he or she must show that "purported comparators . . . have committed offenses of 'comparable seriousness.'" *Opsatnik v. Norfolk Southern Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir.2006)).

Here it is undisputed from the record that Defendant did not have a disciplinary workplace policy. (SSMF ¶ 21; RSSMF ¶ 21.) It is also undisputed that Plaintiff was never disciplined during her employment. (SSMF ¶ 28; RSSMF ¶ 28.) It is further undisputed that the only reason provided

for Plaintiff's termination was her failure to "get along with her co-workers."[13]  (ECF No. 35-3 at 52.)  But the record shows that other employees of Defendant failed to get along with co-workers. For example, it appears clear from the record that Heenan also failed to get along with other workers but was not terminated despite having altercations with Plaintiff and other employees; Defendant only terminated his employment after Heenan assaulted Plaintiff's supervisor, Culp. Similarly, John C. was written up for leaving purge on Plaintiff's seat, but was not terminated even though it is also undisputed from the record that he had left purge on other employees' seats. (SSMF ¶¶ 23-24.)

Based on these undisputed facts, Plaintiff has presented a genuine dispute as to pretext. Because a reasonable juror could find disparity in the disciplinary treatment of Plaintiff compared to Heenan and John C., and because of the repeated safety complaints (one of which was made within three days of her termination), Plaintiff has raised a genuine dispute of fact as to pretext that should be resolved by a jury.

Therefore, because Plaintiff has satisfied the three-part inquiry, her CEPA claim may proceed.

---

[13]      The Court is not persuaded by Defendant's argument that Plaintiff "was terminated for insubordination[] [and] unreliability (including an ongoing refusal to perform a variety of required job tasks)."  (ECF No. 35-1 at 6.)  Defendant has failed to point to any evidence to support this articulated reason for terminating Plaintiff.  Rather, the only reason for Plaintiff's termination that is supported in the record is that she did not get along with co-workers.  (*See* ECF No. 35-3 at 52.)

## IV.    <u>CONCLUSION</u>

For the reasons stated above, and for other good cause shown, Defendants' Motion for

Summary Judgment (ECF No. 35) is **DENIED**.  An appropriate Order follows.


Dated: June 17, 2025

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE